UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
UNITED STATES OF AMERICA,

        v.

MARINA KUYAN,

             Defendant.

-------------------------------------------------------------------X

**MEMORANDUM AND ORDER**
21-CR-497 (WFK)

**WILLIAM F. KUNTZ, II, United States District Judge:**

On May 17, 2024, Marina Kuyan ("Defendant") pled guilty to one count of bank fraud in violation of 18 U.S.C. § 1344. Plea Agreement (the "Plea") ¶ 1, ECF No. 240.[1] The Court now sentences Defendant and provides a complete statement of reasons, under 18 U.S.C. § 3553(c), of those factors set forth by Congress in 18 U.S.C. § 3553(a). For the reasons set forth below, Defendant is hereby sentenced to time served; one (1) year of supervised release with the mandatory, standard, and special conditions of supervision; mandatory restitution as set forth in a forthcoming Order of Restitution; and a $100.00 mandatory special assessment.

## I.    Background

### A. Factual Background

Defendant and others created and executed a bold, fraudulent scheme organized by co-defendant David Motovich ("Motovich"). Motovich operated Midwood Lumber, a family-run business selling building materials and equipment to contractors operating in the New York City metropolitan area. Presentence Investigation Report (the "PSR") ¶ 4, ECF No. 376. Alongside the operation of his family business, Motovich ran an illegal, underground check-cashing business since 2012 (the "Midwood Check-Cashing Business"). *Id.* Defendant was employed by Midwood Lumber and assisted Motovich with the operation of the illegal check-cashing scheme. *Id.* ¶ 5.

---

[1] Citations are to the docket in *United States v. Motovich, et al.*, 21-CR-497. Page pincites refer to the ECF page numbers assigned to a filing, where available, and where no ECF heading is present, to the page numbers listed in the original filing.

1

The Midwood Check-Cashing Business did not abide by applicable federal regulations governing check cashers.[2]  Check cashers have disclosure obligations to prevent illegal activity (e.g., money laundering, sanctions evasion, and terrorism), such as registering with the United States Department of Treasury's Financial Crimes Enforcement Network (FinCEN) and filing Currency Transaction Reports for movements of currency greater than $10,000.00.  *Id.* ¶¶ 13–14. Customers of the Midwood Check-Cashing Business—who were primarily owners and operators of construction-related businesses themselves—used Motovich's services to pay their employees in cash, avoid reporting wages to the Internal Revenue Service, and evade paying Federal Insurance Contribution Act (FICA) taxes.  *Id.* ¶ 16.

To conceal the illegal conduct, Defendant—at Motovich's direction—incorporated numerous shell companies which had no legitimate business purpose.  *Id.* ¶¶ 18, 24–25.  These entities were created solely to facilitate the illegal check-cashing scheme.  *See id.* ¶ 19.  The shell companies often copied the names of existing businesses, lending them an air of legitimacy.  *Id.* In doing so, signatures for principals of these companies were forged, sometimes hundreds of times, placing small business owners at risk of both reputational and legal harm.  *See id.* ¶¶ 19, 21, 24, 27.

Motovich, Defendant, and others would instruct customers of the Midwood Check-Cashing Business to issue blank checks or checks payable to one of the shell companies, which would be returned as cash.  *Id.* ¶ 18.  To disguise these transactions as legitimate business expenses, Defendant prepared fraudulent insurance certificates, purchase invoices, and other documents for customers of the scheme.  *Id.* ¶¶ 5, 21.

---

[2] By definition, "check cashers" are persons in the business of "accept[ing] checks . . . in return for currency or a combination of currency and other monetary instruments or other instruments, in any amount greater than $1,000[.00] for any person on any day in one or more transactions[.]"  PSR ¶ 13.

2

Defendant and Motovich also opened bank accounts in the names of the shell companies at several financial institutions to deposit the cash into. *Id.* ¶ 22. In doing so, Defendant made materially false representations to banks, such as falsely representing the identity of the account's beneficial owners. *Id.* ¶ 27.

The Midwood Check-Cashing Business caused real harm to small businesses. For example, one victim of the check cashing scheme, Ago Kolenovic, was sued for business activity associated with a shell company incorporated under his family business's name. *Id.* ¶ 19. A subcontractor confronted Kolenovic after receiving a bounced check from the shell company, which the subcontractor believed was from Kolenovic's family business. *Id.* In another instance, after learning Midwood Lumber was forging her signature to issue fraudulent insurance certificates in the name of her small, family brokerage business, Marcy Vukel contacted Defendant and asked her and Motovich to stop using her information. *Id.* ¶ 21. Defendant and Motovich continued to use Vukel's signature and the name of her family's company anyway. *Id.*

Meanwhile, Motovich profited generously from the scheme. He cashed millions of dollars through the Midwood Check-Cashing Business in exchange for a fee ranging between 4% and 15% on each transaction (as compared to the 2–3% fee typical of a licensed check-cashing business). *Id.* ¶ 17. Midwood Lumber was equipped with a secret room with safes which regularly contained hundreds of thousands of dollars in cash. *Id.* ¶ 16. During a federal law enforcement search of Midwood Lumber, officers recovered off-the-book payroll records from Defendant's desk showing what Midwood Lumber employees—including Defendant— were paid off-the-books in cash versus check. *Id.*; First Add. to PSR at 2, ECF No. 379. Motovich did not report any of the illicit proceeds he made from the check-cashing business. PSR ¶ 19.

3

### B. Procedural History

#### 1. *The Instant Case*

On September 22, 2021, a U.S. Grand Jury returned an eighteen-count indictment (the "Indictment") against Defendant, Motovich, Joshua Markovics ("Markovics"), and Kemal Sarkinovic ("Sarkinovic," together with Defendant, Motovich, and Markovics, "Defendants"). *See generally* Indictment, ECF No. 19. Counts Three through Six alleged Defendant engaged in bank fraud in violation of 18 U.S.C § 1344; Count Seven alleged Defendant engaged in conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349; Counts Eight through Thirteen alleged Defendant engaged in money laundering in violation of 18 U.S.C. § 1957(a); Count Fifteen alleged Defendant engaged in conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h); Count Sixteen alleged Defendant engaged in aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1), (b), and (c)(5); and Count Seventeen alleged Defendant engaged in conspiracy to defraud the United States in violation of 18 U.S.C. § 371. *Id.* ¶¶ 30–42. The Indictment also raised criminal forfeiture allegations as to all counts against Defendant except Count Sixteen. *Id.* ¶¶ 45–50.

On September 23, 2021, U.S. Department of Justice special agents arrested Defendant. PSR ¶ 32. The same day, Defendant was arraigned before Magistrate Judge Robert M. Levy and pled not guilty to all counts. ECF No. 25. Defendant was later released on bail, which was set at $100,000.00 with two sureties. *Id.*

On May 17, 2024, Defendant pled guilty to Count Three of the Indictment. Plea ¶ 1; *see also* Indictment ¶¶ 30–31. Pursuant to the Plea, Defendant agreed not to file an appeal or otherwise challenge her sentence if the Court imposes a term of six months' incarceration or below. Plea ¶ 4. The Government agreed no further criminal charges would be brought against

Defendant for her participation in criminal activity involving the variety of conduct to which she pled guilty. *Id.* ¶ 5(a). Additionally, the Government agreed to "dismiss the remaining counts of the Indictment with prejudice" as to Defendant at the time of sentencing. *Id.*

    2. *Pleas, Verdicts, and Sentencing of Co-Defendants*

On March 3, 2022, Sarkinovic pled guilty to Count Seven of the Indictment. Sarkinovic Agreement, ECF No. 74. There is no sentencing hearing scheduled for Sarkinovic at this time.

On July 2, 2024, Markovics pled guilty to Count Seven of the Indictment. Markovics Agreement ¶ 1, ECF No. 290. On April 24, 2026, Markovics was sentenced to thirty months' incarceration to be followed by one year of supervised release, a $10,000.00 fine, and $330,552.00 in mandatory restitution. *See* Markovics Sent'g Mem. and Ord. at 1, ECF No. 509.

Motovich proceeded to trial on July 8, 2024. On July 30, 2024, Motovich was found guilty on sixteen of the eighteen counts charged in the Indictment. ECF No. 349. On November 19, 2025, he was sentenced to 180 months' incarceration to be followed by two years of supervised release with both the standard and special conditions of supervision. Motovich Sent'g Mem. and Order at 1, ECF No. 451. Defendant challenged the monetary amount of forfeiture and restitution, and his motion remains pending. ECF No. 469; *see also* ECF No. 476.

## II.     Legal Standard

Congress set forth the procedures for imposing a sentence in a criminal case in 18 U.S.C. § 3553. Together with 18 U.S.C. § 3553, the U.S. Federal Sentencing Guidelines (the "Sentencing Guidelines," or "Guidelines," or "U.S.S.G.") operate as the "starting point and . . . initial benchmark" for a court evaluating a criminal sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). If and when a trial court chooses to impose a sentence outside of the Sentencing Guidelines range, the court "shall state in open court the reasons for its imposition of the

particular sentence, and . . . the specific reason for the imposition of a sentence different from that described" in the Guidelines.  18 U.S.C. § 3553(c)(2).  The court must also "state[] with specificity" its reasons for so departing "in a statement of reasons form." *Id.*  The court's statement of reasons "shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)." *United States v. Davis*, 08-CR-332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.) (internal citation omitted).

When determining the appropriate sentence, the Court must consider seven different factors: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the kinds of sentence and the sentence range established by the Guidelines; (5) any pertinent policy statements issued by the U.S. Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).  The Court now addresses each factor in turn.

## III.    Analysis

### A.  The Nature and Circumstances of the ●ffense and the History and Characteristic of the Defendant

The first § 3553(a) factor requires the Court to evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).

#### 1.    *Family and Personal History*

Defendant was born on October 31, 1963, in Kyiv, Ukraine, to the marital union of Lev Bogomolnyy and Irena Bogomolnyaa.  PSR ¶ 54.  Defendant was raised in a "lower-income" household where food and clothing were difficult to obtain. *Id.* ¶ 56.  Throughout her

6

upbringing, Defendant experienced physical and mental abuse from her mother. *See* Def.'s Sent'g Mem. at 4–5. Although Defendant's parents were "accomplished math teachers," her family's opportunities in Ukraine were limited by the discrimination they faced due to their Jewish background. PSR ¶ 56. Defendant recalls experiencing discrimination throughout her childhood, including harassment from her classmates at school. *Id.* When Defendant was older, she was denied admission to a local college due to her Jewish heritage. *Id.*

Defendant married her husband Leonid in 1985. *Id.* ¶ 57. Leonid's family was not supportive of their marriage because Defendant was Jewish, and so Leonid's family boycotted their wedding. *Id*; Def's Sent'g Mem. at 5. When Defendant's son Steven was born, ethnic discrimination was so pervasive Defendant was unable to purchase baby supplies in Ukraine, forcing Leonid to travel to Poland for essential supplies. PSR ¶ 57. After the birth of their second son, Arthur, Defendant and her family relocated to the United States in search of greater socio-economic stability and to be near Defendant's sister, Alla. *Id.* Defendant settled in Brooklyn, New York, in approximately 1992. *Id.* ¶¶ 57–58.

The adjustment to the United States was difficult for Defendant; everyone worked to financially support the family, including her parents who relocated with them from Ukraine. *See id.* ¶ 58. According to Defendant, she entered the United States with "no savings, no job prospects, and no fluency in the spoken language." Def.'s Sent'g Mem. at 24. However, by 1996, Defendant and her family had "made significant strides in adjusting to life in America" and were "liv[ing] the American Dream." *Id.* at 9. In 1998, Defendant and her family made a down payment on their first home and relocated to Staten Island. *Id.*

Defendant lost several family members after she arrived in the United States. *See id.* at 11–14. In 2004, Defendant's father died of pancreatic cancer at the age of sixty-nine. PSR ¶ 54.

In 2012, Defendant's sister, Alla, died of colon cancer at the age of fifty-six. *Id.* ¶ 55. Defendants mother, also a cancer-survivor, is now eighty-eight years of age and resides in Brooklyn, New York. *Id.*; Def.'s Sent'g Mem. at 11. She is unaware of Defendant's conviction due to dementia. PSR ¶ 54. Defendant's husband, age 65, also experiences chronic health complications due to a series of strokes he experienced in 2019, and work-related injuries to his shoulder and leg. Def.'s Sent'g Mem. at 21–22.

Defendant received letters of support from close friends and family, including her husband, her two sons, and her daughters-in-law. *See* Def.'s Sent'g Mem., Ex. A.

2.      *Educational and Employment History*

In 1983, Defendant earned a bachelor's degree in education from Kyiv Pedagogical Institute. PSR ¶ 66; Def.'s Sent'g Mem. at 5. She worked as a teacher prior to moving to the United States. Def.'s Sent'g Mem. at 5.

In 1993, after relocating to the United States, Defendant began working as a bookkeeper at Midwood Lumber and Millwork in Brooklyn, New York, where she committed the instant offense. PSR ¶ 69. She is presently employed by the company and reports earning approximately $3,800.00 per month. *Id.*

From 2014 until 2021, Defendant also worked part-time as a personal care assistant at Marina Home Care Services, Inc., a licensed home care services agency.[3] *Id.* ¶ 68. Defendant reports she earned approximately $2,000.00 per month in this role. *Id.*

---

[3] Defendant clarifies the "Marina" in "Marina Home Care Services, Inc." does not refer to her. *See* Def.'s Sent'g Mem. at 15 n.5.

The U.S. Probation Office ("Probation") states Defendant appears able to pay a fine, but does not recommend one based on the priority of restitution.[4]  Prob. Sent'g Recommendation ("Prob. Sent'g Rec.") at 2, ECF No 376-1.

### 3.    *Prior Convictions*

Defendant has no prior juvenile adjudications, adult criminal convictions, or arrests. *Id.* ¶¶ 47–52.

### 4.    *Physical and Mental Health*

 Defendant reports chronic migraines dating back to her childhood in Ukraine. *Id.* ¶ 63; Def.'s Sent'g Mem., Ex. B (Def.'s Medical Records).  She also has high blood pressure and experiences ulcers.  PSR ¶ 63.  Defendant is being treated for her migraines and high blood pressure. *Id.*

Since the commencement of the instant case, Defendant has experienced panic attacks. Def.'s Sent'g Mem. at 18.  She currently sees a psychiatrist and attends bi-weekly cognitive behavioral therapy. *Id.*

### 5.    *Substance Abuse*

Defendant reports no history of drug or alcohol abuse.  PSR ¶ 65.

### 6.    *Nature and Circumstances of the Offense*

The Court's previous statements address the nature and circumstances surrounding the instant offense. *See supra* Part I.

---

[4] In the PSR, Probation stated Defendant appeared unable to pay a fine.  PSR ¶ 77.  However, as indicated above, Probation states in its sentencing recommendation Defendant appears able to pay a fine, but "based on the priority of restitution, a fine has not been recommended."  Prob. Sent'g Rec. at 2.

9

## B.  The Need for the Sentence Imposed

The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2).

The Court's sentence recognizes the seriousness of Defendant's conduct.  Defendant aided a years-long, sophisticated, coordinated scheme to transact large quantities of money through fraudulent bank accounts and shell companies.  *See* PSR ¶¶ 32–33.  The Court's sentence will deter Defendant and others from engaging in similar conduct, justly punish Defendant for her crimes, and protect the public from Defendant's actions.  Accordingly, the Court's sentence is "sufficient, but not greater than necessary" to comply with the purposes set forth in this factor.  18 U.S.C. § 3553(a)(2).

## C.  The Kinds of Sentences Available

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant.  18 U.S.C. § 3553(a)(3).  Defendant pled guilty to one count of bank fraud in violation of 18 U.S.C. § 1344.  Plea ¶ 1.

Defendant faces a maximum term of thirty years' incarceration and no minimum term. 18 U.S.C. § 1344.  Defendant also faces a maximum term of five years of supervised release.  18 U.S.C. § 3583(b).  If a condition of release is violated, Defendant may be sentenced to up to three years of incarceration without credit for pre-release incarceration or time previously served on post-release supervision.  18 U.S.C. § 3583(e).  Defendant is ineligible for a term of

10

probation. 18 U.S.C. § 3561(a)(1). Furthermore, she faces a maximum fine of $1,000,000.00. 18 U.S.C. § 1344.

**D. The Kinds of Sentence and Sentencing Range Established for Defendant's Offense**

The fourth § 3553(a) factor requires the Court to consider "the kinds of sentence and the sentencing range established for . . . [t]he applicable category of offense committed by the applicable category of defendant as set forth in the guidelines." 18 U.S.C. § 3553(a)(4)(A).

Defendant pled guilty to one count of bank fraud in violation of 18 U.S.C. § 1344. Plea ¶ 1. The parties stipulated to a Total Adjusted Offense Level of 6 in the Plea.[5] *See id.* ¶ 2. Defendant did not provide a calculation pursuant to the U.S. Sentencing Guidelines (the "Sentencing Guidelines," or "Guidelines," or "U.S.S.G.") in her sentencing materials but agrees on a Total Adjusted Offense Level of 6. *See* Def.'s Sent'g Mem. at 22, ECF No. 514.

All parties agree the applicable Guidelines provision is U.S.S.G. § 2B1.1. PSR ¶ 38; Gov't Sent'g Mem. at 4, ECF No. 515; Plea ¶ 2; Def.'s Sent'g Mem. at 26–27. U.S.S.G. § 2B1.1(a)(1) provides a Base Offense Level of 7 when defendant was "(A) . . . convicted of an offense referenced to this guideline; and (B) that offense of conviction has a statutory maximum term of imprisonment of 20 years or more[.]" U.S.S.G. § 2B1.1(a)(1). Because the statutory maximum for bank fraud, 18 U.S.C. § 1344, is thirty years, a Base Offense Level of 7 applies. *See* Plea ¶ 1; PSR ¶ 38; Gov't Sent'g Mem. at 4.

Probation and the Government agree one enhancement should apply to Defendant. They assert U.S.S.G. § 2B1.1(b)(11)(C)(i) adds 2 levels because the offense involved the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of

---

[5] The parties initially calculated a Subtotal Adjusted Offense Level of 8. *See* Plea ¶ 2. The Total Adjusted Offense Level the parties stipulated to is 6 because the Subtotal Adjusted Offense Level was subject to a two-level reduction if "[Defendant] clearly demonstrate[d] acceptance of responsibility[.]" *Id.*

identification. PSR ¶ 39; Gov't Sent'g Mem. at 4; *see also* Plea ¶ 2. Because the Subtotal Adjusted Offense Level would be 9 after the application of this two-level enhancement, U.S.S.G. § 2B1.1(b)(11) calls for increasing the offense level to 12. *See id.*; U.S.S.G. § 2B1.1(b)(11) ("If the resulting offense level is less than level 12, increase to level 12.").

Probation and the Government also agree certain mitigating factors should apply to Defendant pursuant to the Guidelines. First, the Government and Probation agree a two-level reduction should apply pursuant to U.S.S.G. § 3B1.2(b) because Defendant was a minor participant in the offense. PSR ¶ 41; Gov't Sent'g Mem. at 4; *see also* Plea ¶ 2.

Second, the Government and Probation agree a two-level reduction should apply because Defendant is a Zero Point Offender pursuant to U.S.S.G. § 4C1.1(a)–(b). PSR ¶ 45; Gov't Sent'g Mem. at 4; *see also* Plea ¶ 2.

Finally, the Government and Probation agree a two-level reduction should apply due to Defendant's acceptance of responsibility under U.S.S.G. § 3E1.1(a). PSR ¶ 44; Gov't Sent'g Mem. at 4; *see also* Plea ¶ 2.

All parties agree Defendant's Criminal History Category is I because she does not have any prior juvenile adjudications or adult criminal convictions. *See* U.S.S.G. § 4A1.1; PSR ¶ 49; Def.'s Sent'g Mem. at 22; Gov't Sent'g Mem. at 4; *see also* Plea ¶ 2. Pursuant to the Sentencing Guidelines Table, a Total Adjusted Offense Level of 6 combined with a Criminal History Category of I results in a Guidelines range of zero (0) to six (6) months' incarceration. U.S.S.G. § 5A.

This Court appreciates the sentencing arguments raised by all parties and seriously considered each in turn.

### E. Pertinent Policy Statement(s) of the Sentencing Commission

The fifth § 3553(a) factor requires the Court to evaluate "any pertinent policy statement . . . issued by the Sentencing Commission." 18 U.S.C. § 3553(a)(5).

Defendant raises a recently proposed amendment to U.S.S.G. § 2B1.1, which she argues "better reflect[s] culpability in situations like [hers]." Def.'s Sent'g Mem. at 26. The proposed amendment would have added a two-level reduction to a Total Adjusted Offense Level under U.S.S.G. § 2B1.1 for defendants who "committed the offense at the direction of his or her employer for fear of negative employment consequences; was motivated by an intimate or familial relationship or by threats or fear to commit the offense and was otherwise unlikely to commit such an offense; or was unusually vulnerable to being persuaded or induced to commit the offense due to a physical or mental condition." *Id.* (citing U.S. Sent'g Comm'n, *Proposed Amendments to the Sentencing Guidelines*, 65 (Dec. 12, 2025)). The amendment was ultimately not adopted. *Id.*

The Court acknowledges this proposed amendment to U.S.S.G. § 2B1.1 and factors its underlying rationale and policy into the Court's decision. Otherwise, the parties have not drawn the Court's attention to any further applicable policy statements. Finding no others on its own, the court proceeds to the next § 3553(a) factor.

### F. The Need to Avoid Unwarranted Sentence Disparities

The sixth § 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

Defendant argues "[w]hile a sentence of time served would be substantially less than what [Defendant's] co-defendants received," it is warranted "given [Defendant's] limited visibility into the overall scheme, the minor role she played in it, and her unique personal history

and characteristics[.]" Def.'s Sent'g Mem. at 30. Defendant distinguishes herself from her co-defendants, noting while she was caring for her sick mother on a "modest annual salary of $45,600[.00,]" Motovich "indulged in a lavish lifestyle" and Markovics did the same on a less grand scale. *Id.* In addition, compared to the remaining defendants to be sentenced, Defendant states she is "the only individual who did not receive any special financial renumeration for her misdeeds." *Id.* at 31.

The Government does not dispute Defendant is less culpable than Motovich. Gov.'t Sent'g Mem. at 5. However, the Government argues "their respective Guidelines ranges—which differ drastically—already account for that distinction." *Id.* Furthermore, the Government disagrees with Defendant's assertion she did not financially benefit from the check-cashing scheme, noting "[a]lthough [Defendant's] sentencing memorandum claims she made approximately $45,600[.00] working for Motovich, she received approximately half of her salary in cash, which went unreported to her accountant." *Id.* at 3.

The Court has reviewed and considered carefully Defendant's arguments. For the reasons stated in this Memorandum and Order, and considering the other six § 3553(a) factors, the Court's sentence avoids unwarranted sentence disparities.

## G. The Need to Provide Restitution

Finally, the seventh § 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). Pursuant to the Plea, Defendant agreed to restitution "[i]n the full amount of each victim's losses as determined by the Court." Plea ¶ 1(e). The Government indicated the victims of the offense have been contacted for purposes of restitution, but no responses have been received to date. PSR ¶ 34. The Court reserves its right, pursuant to 18 U.S.C. § 3664(d)(5), to hold an evidentiary hearing within

14

ninety (90) days after this sentencing to determine the specific amounts owed to Defendant's victims. The Court will issue a Final Order of Restitution accordingly.

## IV.    Conclusion

For the reasons set forth above, the Court sentences Defendant to time served; one (1) year of supervised release with the mandatory, standard, and special conditions of supervision; restitution as set forth in a forthcoming Order of Restitution; and a $100.00 mandatory special assessment. This sentence is sufficient, but not greater than necessary, to accomplish the purposes of § 3553(a)(2).

The Court expressly adopts the factual findings of the PSR and Addenda thereto, as corrected herein, to the extent those findings are not inconsistent with this opinion. The Court advises the Defendant she has fourteen (14) days to appeal the order and judgment of this court from the date the order and judgment are entered.

**SO ORDERED.**

**s/WFK**

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: June 1, 2026
      Brooklyn, New York